**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE, | : |
| | : |
| Plaintiff, | :   Civil Action No. _____ |
| | : |
| v. | :   JURY TRIAL DEMANDED |
| | : |
| INDEPENDENCE BLUE CROSS, | : |
| | : |
| Defendant | : |
| | : |

## THE PARTIES

1.      Plaintiff, Jane Doe (hereinafter "Plaintiff" or "Ms. Doe") is a citizen and resident of

Philadelphia, Pennsylvania, and a health insurance customer of Defendant, Independence

Blue Cross.  Plaintiff is appearing under a pseudonym and a motion for anonymity has

been filed concurrently herewith.

2.      Defendant, Independence Blue Cross (hereinafter "Defendant," "Independence Blue

Cross," or "IBX"), is a health insurance company with its headquarters and principal

place of business located at 1901 Market Street, Philadelphia, PA 19103.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the parties and claims pled herein pursuant to 28 U.S.C.

§ 1331.

4.      This Court has supplemental jurisdiction over related state law claims pled herein

pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-

5(f)(3).

## MATERIAL FACTS

6. Ms. Doe is transgender or trans. Ms. Doe is a transgender woman. Trans women identify as women.

7. "Gender identity" is a clear and well-established medical concept that refers to one's sense of oneself as having a particular gender.

8. Although many people who are designated male at birth based on external anatomy identify as men, people who are transgender have a gender identity that differs from the sex that was assigned to them at birth. Transgender men are men who were assigned "female" at birth but have a male gender identity; transgender women are women who were assigned "male" at birth but have a female gender identity.

9. There are people who are transgender who experience feelings of incongruence between their gender identity and the sex they were assigned at birth, and experience distress as a result of that incongruence, which are symptoms of gender dysphoria ("GD"). Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders 5 (DSM-5) and International Classification of Diseases (ICD-10).

10. The widely accepted standards of care for treatment of gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by leading medical organizations, the U.S. Department of Health and Human Services, Federal courts, and the Pennsylvania Department of Human Services.

11. Under the WPATH standards, medically necessary treatment for gender dysphoria may require facial feminization surgery ("FFS"), hair transplant, and related procedures.

12. According to every leading major medical organization and the overwhelming

consensus among medical experts, treatment of gender dysphoria, including surgical procedures such as FFS procedures, hair transplant, and related procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria.

13. Being transgender or trans is likely due to brain neuroanatomy and the formation of that brain neuroanatomy in the womb at birth, meaning that there is a physical, biological, congenital, and/or functional component to being transgender.

14. At all times relevant hereto, Defendant issued and had in place for the Plaintiff a policy of health insurance (hereinafter "the Policy" or "the subject Policy") to insure Plaintiff for health insurance. At all times relevant hereto, Defendant insured Plaintiff for expenses and costs related to her healthcare. A true and correct copy of what was provided to Plaintiff as the subject "Commercial Medical Policy" for "Treatment of Gender Dysphoria" is attached hereto as Exhibit "A."

15. At all times relevant hereto, Plaintiff paid the required percentage of health insurance premium costs and complied with all terms and conditions of the subject Policy.

16. Defendant discriminated against Ms. Doe on the basis of Ms. Doe's gender identity, on the basis of Ms. Doe's gender, and on the basis of Ms. Doe's disability by, *inter alia*, denying health insurance coverage to Ms. Doe for a series of surgical facial procedures known as "Facial Feminization Surgery" or "FFS," as well as hair transplant and related procedures.

17. The denials lack medical support, are undercut by Defendant's own policies, medical research, and/or medical references, are arbitrary, capricious, and discriminatory, and violate Defendant's own policies as well as Federal law.

18. As a direct result of Defendant's unlawful discriminatory and bad-faith insurance denials

and practices, as well as Defendant's breach of contract and its duty of good faith and fair dealing to Ms. Doe, Ms. Doe has sustained economic and non-economic harms and damages as explained more fully below.

19.     Plaintiff, at all times relevant hereto, was diagnosed with gender dysphoria ("GD"). Plaintiff is a transgender person who has been diagnosed with GD.

20.     Ms. Doe suffers from gender dysphoria or GD, at all relevant times hereto suffered from GD, and has been diagnosed with the same, on account of repeated instances of mistreatment, harassment, physical, and sexual abuse that Ms. Doe has received on account of her gender identity, including being physically and sexually assaulted in public because Ms. Doe is transgender.  As a result, Ms. Doe finds it difficult to go out in public, to work, to participate or function in society (social and occupational functioning), and to interact or communicate with others, on account of her severe and debilitating gender-dysphoria diagnosis.

21.     GD is a medical and therapeutic diagnosis "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning" for a person who is transgender.  *See Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. ("DSM-V" at 302.85); *see also* Coleman, E., *et al.*, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health*, *23*(S1), S1-S260 (2022).

22.     The psychological stress of being transgender may lead to a number of medical conditions including a condition known as gender dysphoria ("GD") which is a disability.

23.     GD substantially impairs one or more major life activities, including, but not limited to, neurological, brain, social, and occupational functions.

24. People who are transgender are diagnosed as suffering from GD when they have "clinically significant distress" associated with being transgender.

25. GD is a disability in that it substantially impairs one or more major life activities, including, but not limited to, neurological, brain, social, and occupational functions.

26. Ms. Doe is a person with a disability within the definitions of the Americans with Disabilities Act ("ADA") and Section 1557 of the Affordable Care Act ("ACA") because of an actual or perceived physical or mental impairment.

27. Various medical procedures are available to assist transgender women to ensure a body that is more in congruence with their gender identity. These procedures may also alleviate gender dysphoria.

28. Ms. Doe applied to Defendant IBX for coverage of FFS in attempts to alleviate her gender dysphoria.

29. Defendant IBX discriminated against Plaintiff by refusing to cover Plaintiff's FFS surgeries, hair transplant, and related procedures in violation of its own insurance policy and in violation of Federal law including Title III of the ADA and Section 1557 of the ACA.

30. Plaintiff attempted to appeal the decision to deny coverage for FFS surgeries to Plaintiff under Defendant's policy of insurance.

31. Defendant IBX issued a denial of Plaintiff's appeal of the decision to deny coverage for her FFS procedures based on her gender dysphoria.

32. Defendant IBX issued a second denial of Plaintiff's appeal of the decision to deny Plaintiff coverage for FFS surgeries under Defendant's policy of insurance.

33. Plaintiff contacted Defendant through its insurance claims agents and representatives

from in or around 2020 through 2021 multiple times. Plaintiff contacted Defendant through its insurance claims agents and representatives multiple times in attempts to appeal to them with respect to Defendant's denial of coverage to Plaintiff, and to attempt to obtain more information from Defendant about Defendant's reasons for denying coverage to Plaintiff.

34. On one such occasion, upon information and belief, in or around 2020, Defendant's insurance claims representative stated to Plaintiff that a "physical or functional component must be demonstrated" to Plaintiff's disability in order for Plaintiff's disability to be covered.

35. On that occasion, Plaintiff had prepared a statement to read to the Defendant. Plaintiff stated to Defendant's insurance claims representative,

> My desire is to obtain a body that enables me to engage and function in society. My current body does not. Here are some examples: Fired from a job for the lone sole reason of being trans and perceived as trans. Being insulted and mocked in every interaction including work and every single social encounter I have every day. Every interaction is a high-risk moment that can and has turned violen[t]. Including groups of strangers grabbing me in the crotch in public and surrounding me threateningly while laughing, being typically referred to as 'it' by cashiers. I just want a body that enables me to engage and function in society. I don't want to be singled out or noticed. I just want to be normal and be perceived within the normal range of females. I want to blend in.

36. The claims agent repeated, "A physical or functional impairment must be demonstrated."

37. Plaintiff recollects that she had the same or a similar conversation with the Defendant's claims representatives about Defendant's discrimination against the Plaintiff so many times that Plaintiff has lost count.

38. Defendant initially denied coverage to Plaintiff for FFS surgeries without relying on any photographs being submitted. Defendant's denial was arbitrary, capricious, discriminatory, and without merit. Defendant's denial was discriminatory as the denial

was impermissibly based on the fact that Defendant did not want to cover transgender-related surgeries, and wanted to avoid the cost and expense of doing the same, in Plaintiff's case and in any other transgender case, which constitutes impermissible gender and gender-identity based discrimination.

39. After receiving the initial denial from Defendant, Plaintiff submitted photographs of herself to Defendant to support her requests. After that time, Defendant's claims agent admitted that the denial was based on the "personal impression of whether or not you look female," or words to that effect.

40. On another occasion, after Plaintiff and her counsel at the time contacted Defendant through its claims agent/representative, Plaintiff recollects that either she or her counsel at the time stated to the claims agent that the language being used in the denial by the Defendant was confusing, or words to that effect. The claims agent speaking with the Plaintiff stated to Plaintiff that the language being used by the Defendant was "just jargon," or words to that effect.

41. Plaintiff recollects that she was repeatedly misgendered by Defendant's claims agents/representatives who used incorrect pronouns that were not Plaintiff's preferred pronouns when referring to Plaintiff.

42. On one occasion, in or around January 2021, to Plaintiff's recollection, she was on the phone with one of Defendant's claims representatives, when Plaintiff was misgendered with incorrect pronouns by the Defendant's claims representative. Plaintiff corrected the pronouns that the claims representative was using, and the Defendant's claims representative continued to misgender Plaintiff with incorrect pronouns that were not the Plaintiff's preferred pronouns. The claims representative then transferred the Plaintiff to

what sounded like dead air. Plaintiff waited for a long period of time and nobody picked up the line. Plaintiff called back the number and was told to contact another individual and was then transferred to another extension. However, Plaintiff was actually sent to a general automated mailbox, which stated, "Input the name of the person you are trying to reach," and after multiple attempts of attempting to input the individual's name Plaintiff was provided, the directory did not recognize the name. Plaintiff called back the individual using another number.

43. On June 7, 2021, Defendant issued a final denial of the decision to deny Plaintiff coverage for FFS surgeries under Defendant's policy of insurance.

44. Defendant denied coverage to Plaintiff for surgeries in June of 2021 on the basis that Plaintiff "did not demonstrate a facial appearance outside the broad range of normal for the female gender" constituting impermissible sex stereotyping and disability-based discrimination.

45. Plaintiff recollects that she experienced episodes of emotional distress following phone calls with the Defendant's claims agents/representatives.

46. Plaintiff's gender-dysphoria disability was exacerbated by Defendant's discriminatory acts. The surgeries at issue were life-and-death matters for Plaintiff.

47. Plaintiff was forced to expend large sums of monies to undergo various FFS procedures without being covered under Defendant's policy of insurance at that time. Plaintiff recollects that she considered committing suicide.

48. As a result of Defendant's discriminatory acts committed against Plaintiff, she refused to go out in public, to go shopping, to participate in video or Zoom calls, and frequently did not take photographs.

49. Plaintiff was caused to suffer the following economic damages on account of the Defendant's illegal and discriminatory actions, which amounts set forth below Plaintiff seeks to recover from the Defendant in this action:

   a. $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related procedures;

   b. $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses;

   c. $12,902.00 in attorneys' fees and costs paid to Plaintiff's first attorney—not undersigned counsel—to challenge Defendant's illegal and discriminatory denials of insurance coverage to Plaintiff through Defendant's pre-litigation administrative process;

   d. Attorneys' fees and costs of previous counsel and undersigned counsel to prosecute the instant action;

   e. Any other out-of-pocket expenses, incidental damages, consequential damages, economic damages, and/or related damages, compensable under local, state, or Federal law.

50. Defendant IBX rejected coverage for the requested procedures calling them cosmetic and not medically necessary when FFS procedures are, in fact, medically necessary and not cosmetic for individuals like Plaintiff who have been diagnosed with gender dysphoria ("GD").

51. IBX rejected coverage for the requested procedures based on a requirement that Plaintiff "demonstrate a facial appearance outside the broad range of normal for the female

gender" which constitutes impermissible gender stereotyping in violation of Section 1557 of the Affordable Care Act.

52. The Supreme Court of the United States' decision in <u>Bostock v. Clayton County, Georgia</u>, Consolidated Case No. 17-1618, 590 U.S. ____, 140 S. Ct. 1731, 2020 WL 3146686 (U.S. June 15, 2020), further supports Plaintiff's position in this matter that Defendant has impermissibly discriminated against Plaintiff based on gender stereotyping in violation of the ACA in the instant case.

53. IBX's objection is further evidence of IBX's arbitrary, capricious discrimination as it is believed such a requirement is not needed in other similar types of surgeries for non-trans people and that no other insurance company has such a requirement.

54. IBX rejected coverage for the requested procedures on the basis that Plaintiff has demonstrated a *mental* impairment, and has not demonstrated a *physical* impairment, which is incorrect as Plaintiff has demonstrated a physical, functional, congenital, and/or biological component to her condition.

55. Defendant's denial stated that Plaintiff was required to demonstrate a physical or functional component (such as, for example, disfigurement) to obtain coverage for FFS under Defendant's policy. However, Plaintiff *has* demonstrated a physical or functional impairment (gender dysphoria), and Defendant's denial is arbitrary, capricious, and discriminatory.

56. IBX's rejection of coverage on the basis that Plaintiff has demonstrated a *mental* impairment, as opposed to a *physical* impairment, in addition to being factually incorrect, also constitutes impermissible discrimination, or disparate treatment, based on disability and based on sex.

57.     For example, an individual with a "disorder of sexual development," who is intersex, or who has suffered disfigurement, would be covered under Defendant's interpretation, but an individual who is transgender with gender dysphoria ("GD") would never be covered under Defendant's interpretation of its policy constituting discrimination.

58.     By way of another example, an individual who had the unfortunate luck to have had, for example, their male genitals removed at birth or early in their life, and they felt they were required to learn to live their life in conformity with all of society's consequent stereotypes and expectations for a person without male genitals, or a female, would be covered under Defendant's policy. However, a person who is transgender, with gender dysphoria ("GD"), would never be covered under Defendant's policy.

59.     In this theoretical example, or in the example of disfigurement (for example, a car accident), in other words, where a person is stuck with a body through no fault of their own that does not conform to society's expectation for their gender, in such a situation FFS procedures would be covered under Defendant's policy, but an individual who was stuck in a body at birth that through no fault of their own did not match their internal sense of their gender, and which caused the person to suffer from gender dysphoria ("GD"), would never be covered under Defendant's policy constituting discrimination.

60.     Such a distinction constitutes discrimination and is no different than, for example, covering a mastectomy for purposes of a car accident, but not for purposes of gender confirmation surgery ("GCS"), which constitutes impermissible gender-identity based and gender-based discrimination.

61.     Defendant's decision to deny coverage to Ms. Doe for FFS surgeries constitutes discrimination against her on account of her being transgender, based on her gender

dysphoria, and/or on the basis of impermissible gender stereotypes.

62. FFS is by definition reconstructive surgery and a medical necessity for transgender women with gender dysphoria ("GD") such as Ms. Doe.

63. There is no credible support for the IBX Denial.

64. FFS is a medically-recognized standard-of-care medical treatment for a transgender person suffering from gender dysphoria ("GD").

65. The surgery is medically necessary and not cosmetic. An authoritative reference, ignored by IBX, notes that FFS is <u>not</u> cosmetic:

[D]emarcation between 'necessity' and 'cosmetic' in transgender healthcare based on specific body parts *is in direct opposition* to the scientific community's understanding of gender dysphoria and professional guidelines for transgender health.
         *                *                *
*While cosmetic surgery is intended to produce beauty, FFS is undertaken to produce femaleness.* Like GRS, FFS is intended to transform the patient's gender from male to female. FFS is not driven by a desire to achieve cosmetic improvement; it is driven by a desire to obtain a body that enables one to engage and function in society.

There are many examples of when evidence regarding the impact of a given procedure on quality of life has led to changes in insurance coverage and reclassification of a procedure from 'cosmetic' to 'necessary.' Breast augmentation is considered a cosmetic procedure and not covered by insurance but reconstructive breast surgery for cancer patients that have undergone mastectomies is considered medically necessary and therefore a covered service. Similarly, we no longer consider facial surgery for victims of extensive burns to be 'cosmetic'. So too should FFS no longer be considered 'cosmetic' but medically necessary.

*Facial Feminization Surgery: The Ethics of Gatekeeping in Transgender Health,* Am J Bioeth. 2018 Dec.; 18(12): 3–9 (emphasis added.)

66. IBX's own Policy for Cosmetic Procedures (No. 12.01.03) references medical research that support FFS coverage in cases of a person who is transgender suffering from GD, and so contradicts the Denial. IBX's Policy for Cosmetic Procedures (No. 12.01.03) contains references that make clear that reconstructive or plastic surgery are both medically necessary and are different than cosmetic surgery.

67.     There has been a failure on the part of IBX act in accordance with its own medical

        research.

**CLAIMS FOR RELIEF**

**COUNT I:**
**DISCRIMINATION BASED ON SEX IN VIOLATION OF SECTION 1557 OF THE**
**AFFORDABLE CARE ACT, 42 U.S.C. § 18116**
**(PLAINTIFF, JANE DOE v. DEFENDANT, INDEPENDENCE BLUE CROSS)**

68.     Ms. Doe restates and realleges all previous paragraphs as though fully set forth here.

69.     Congress prohibited sex discrimination in any health care program and activity, including

        policies of insurance issued on behalf of health insurance companies, that includes the

        Defendant, at 42 U.S.C. § 18116, also known as Section 1557, the Affordable Care Act.

70.     42 U.S.C. § 18116 provides, in pertinent part, as follows;

        §18116. Nondiscrimination.

        (a)  In general.

                Except as otherwise provided for in this title (or an amendment made by this
                title), an individual shall not, on the ground prohibited under title VI of the Civil
                Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education
                Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of
                1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from
                participation in, be denied the benefits of, or be subjected to discrimination under,
                any health program or activity, any part of which is receiving Federal financial
                assistance, including credits, subsidies, or contracts of insurance, or under any
                program or activity that is administered by an Executive Agency or any entity
                established under this title (or amendments). The enforcement mechanisms
                provided for and available under such title VI, title IX, section 794, or such Age
                Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

71.     Section 1557 of the Affordable Care Act, along with its implementing regulations, at 45

        CFR § 92, et seq., 81 FR 31375-473 (May 18, 2016), have adopted the ACA non-

        discrimination rule, which prohibits discrimination based on sex, gender identity, and

        gender expression, by referring to and incorporating therein the prohibitions of Title IX

(20 U.S.C. § 1681) against sex discrimination including its enforcement provisions.

72.  According to 45 CFR § 92.1, "Section 1557 requires the application of the enforcement

mechanisms under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*),

Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), the Age

Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), and Section 504 of the

Rehabilitation Act of 1973 (29 U.S.C. 794) for purposes of violations of Section 1557

and this part."  45 CFR § 92.1 (Subpart A – General Provisions).

73.  45 CFR § 92.2 further provides, in pertinent part:

> Except as provided in Title I of the Patient Protection and Affordable Care Act (or
> any amendment thereto), an individual shall not, on any of the grounds set forth in
> paragraph (b) of this section, be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under any health program or activity,
> any part of which is receiving Federal financial assistance (including credits,
> subsidies, or contracts of insurance) provided by the U.S. Department of Health
> and Human Services; or under any program or activity administered by the
> Department under such Title; or under any program or activity administered by
> any entity established under such Title.

45 CFR § 92.2.

74.  Defendant IBX was required to certify compliance with the prohibitions against sex

discrimination in 42 U.S.C. § 18116 in order to participate in the Commonwealth of

Pennsylvania's State Health Insurance Exchange, under 45 C.F.R. § 92.4:

Assurances.

> (a) Assurances. An entity applying for Federal financial assistance to which this
> part applies shall, as a condition of any application for Federal
> financial assistance, submit an assurance, on a form specified by the Director of
> the Department's Office for Civil Rights, that the entity's health programs or
> activities will be operated in compliance with section 1557 and this part. A health
> insurance issuer seeking certification to participate in an Exchange or
> a State seeking approval to operate a State Exchange to which section 1557 or this
> part applies shall, as a condition of certification or approval, submit an assurance,
> on a form specified by the Director of the Department's Office for Civil Rights,
> that the health program or activity will be operated in compliance with section

1557 and this part. An applicant or entity may incorporate this assurance by reference in subsequent applications to the Department for Federal financial assistance or requests for certification to participate in an Exchange or approval to operate a State Exchange.

75. Section 1557 provides that "an individual shall not, on the ground prohibited under …Title IX of the Education Amendments of 1972 (20 U.S.C. 1681, et seq.)" – which prohibits discrimination "on the basis of sex" – "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).

76. The Department of Health and Human Services ("HHS") regulations including the ACA non-discrimination rule apply to "covered entities" and prohibit discrimination on the basis of gender identity. 45 C.F.R. §§ 92.4, 92.207.

77. Defendant is an issuer of insurance products, plans, and benefits that receive Federal financial assistance for those products, plans, and benefits, and/or also provide third-party administrator services.

78. Defendant is a "covered entity" under 45 C.F.R. § 92.4.3.

79. Discrimination on the basis of gender identity, transgender status, gender transition, or gender nonconformity constitutes discrimination on the basis of "sex" under Section 1557.

80. Ms. Doe has been wrongfully subjected to discrimination by IBX because of her sex.

81. Defendant acted recklessly and/or with deliberate indifference to Ms. Doe's Federally-protected rights in violation of Section 1557 despite Defendant's knowledge and awareness that their actions constituted gender-stereotyping discrimination.

82. Ms. Doe seeks redress for any and all economic harms and damages directly and proximately caused by the discrimination of IBX as appropriate under 42 U.S.C. § 18116, as well as attorneys' fees and costs as the prevailing party in this action.

83. Plaintiff was directly and proximately caused by Defendant to suffer the following economic harms and damages on account of the Defendant's illegal and discriminatory actions, which amounts and any other amounts were reasonable, necessary, and related. Plaintiff seeks to recover from the Defendant in this action:

   a. $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related procedures;

   b. $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses;

   c. $12,902.00 in attorneys' fees and costs paid to Plaintiff's first attorney— not undersigned counsel—to challenge Defendant's illegal and discriminatory denials of insurance coverage to Plaintiff through Defendant's pre-litigation administrative process;

   d. Attorneys' fees and costs of previous counsel and undersigned counsel to prosecute the instant action;

   e. Any other out-of-pocket expenses, incidental damages, consequential damages, economic damages, and/or related damages, compensable under local, state, or Federal law.

84. In addition to wrongfully denying Plaintiff insurance coverage on account of her gender identity, on account of gender stereotypes, and/or on account of sex, Defendant's agents,

servants, employees, and/or representatives repeatedly and frequently misgendered Ms. Doe on account of her gender identity, based on gender stereotypes, and/or on account of sex, despite repeated requests from Ms. Doe to have her preferred pronouns honored.

85. In addition to seeking full economic redress for harms and damages as well as attorneys' fees, the Plaintiff seeks with this litigation an order from the Court for equitable or injunctive relief to require the Defendant to insure Plaintiff and other people who are transgender with gender dysphoria for facial feminization surgeries on an equal and non-discriminatory basis; to adopt and enforce a written policy, procedure, or guideline to this effect; to perform necessary training and education related thereto; to immediately order the Defendant to perform a re-evaluation of Plaintiff's claim; to post and disseminate notice of the verdict in this matter; and for Defendant to hold sensitivity trainings for its employees, claims agents, representatives, and specialists.

**WHEREFORE,** as a direct and proximate result of the foregoing discrimination, Plaintiff suffered injuries and damages and requests that judgment be entered for Plaintiff and against Defendant for an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all actual damages, out-of-pocket costs and expenses, incidental damages, consequential damages, economic damages, and/or related damages as permitted by applicable law, an award of reasonable attorneys' fees, reasonable expert fees, and the costs and expenses incurred in this action, pursuant to 42 U.S.C. § 1988, and/or as otherwise provided by applicable Federal law, pre- and post-judgment interest, equitable or injunctive relief, and such other relief as this Court should deem just, proper, and equitable.

## COUNT II:
## DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT, 42 U.S.C. § 18116
## (PLAINTIFF, JANE DOE v. DEFENDANT, INDEPENDENCE BLUE CROSS)

86. Ms. Doe restates and realleges all previous paragraphs as though fully set forth here.

87. Ms. Doe has a disability, gender dysphoria, or "GD," covered within the meaning of Section 1557 of the Affordable Care Act.

88. Congress prohibited discrimination in any health care program and activity, including policies of insurance issued on behalf of health insurance companies, on the basis of disability, that includes the Defendant, at 42 U.S.C. § 18116, also known as Section 1557, the Affordable Care Act.

89. 42 U.S.C. § 18116 provides, in pertinent part, as follows;

§18116. Nondiscrimination.

(a) In general.

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), **_or section 794 of title 29 [the Rehabilitation Act],_** be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

90. According to 45 CFR § 92.1, "Section 1557 requires the application of the enforcement mechanisms under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) for purposes of violations of Section 1557 and this part." 45 CFR § 92.1 (Subpart A – General Provisions).

91. Defendant IBX was required to certify compliance with the prohibitions against discrimination based on disability as set forth in 42 U.S.C. § 18116 in order to participate in the Commonwealth of Pennsylvania's State Health Insurance Exchange, under 45 C.F.R. § 92.4:

Assurances.

> (a) Assurances. An entity applying for Federal financial assistance to which this part applies shall, as a condition of any application for Federal financial assistance, submit an assurance, on a form specified by the Director of the Department's Office for Civil Rights, that the entity's health programs or activities will be operated in compliance with section 1557 and this part. A health insurance issuer seeking certification to participate in an Exchange or a State seeking approval to operate a State Exchange to which section 1557 or this part applies shall, as a condition of certification or approval, submit an assurance, on a form specified by the Director of the Department's Office for Civil Rights, that the health program or activity will be operated in compliance with section 1557 and this part. An applicant or entity may incorporate this assurance by reference in subsequent applications to the Department for Federal financial assistance or requests for certification to participate in an Exchange or approval to operate a State Exchange.

92. The Department of Health and Human Services ("HHS") regulations including the ACA non-discrimination rule apply to "covered entities" and prohibit discrimination on the basis of disability. 45 C.F.R. §§ 92.4, 92.207.

93. Defendant is a "covered entity" under 45 C.F.R. § 92.4.3.

94. Ms. Doe has been wrongfully been subjected to discrimination by IBX because of her disability (gender dysphoria).

95. Ms. Doe seeks redress for any and all economic harms and damages directly and proximately caused by the discrimination of IBX as appropriate under 42 U.S.C. § 18116, as well as attorneys' fees and costs as the prevailing party in this action.

96. Plaintiff was directly and proximately caused by Defendant to suffer the following

economic harms and damages on account of the Defendant's illegal and discriminatory actions, which amounts and any other amounts were reasonable, necessary, and related. Plaintiff seeks to recover from the Defendant in this action:

    a.    $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related procedures;

    b.    $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses;

    c.    $12,902.00 in attorneys' fees and costs paid to Plaintiff's first attorney—not undersigned counsel—to challenge Defendant's illegal and discriminatory denials of insurance coverage to Plaintiff through Defendant's pre-litigation administrative process;

    d.    Attorneys' fees and costs of previous counsel and undersigned counsel to prosecute the instant action;

    e.    Any other out-of-pocket expenses, incidental damages, consequential damages, economic damages, and/or related damages, compensable under local, state, or Federal law.

97.    In addition to wrongfully denying Plaintiff insurance coverage on account of her gender dysphoria disability, Defendant's agents, servants, employees, and/or representatives repeatedly and frequently misgendered Ms. Doe on account of her gender dysphoria disability, despite repeated requests from Ms. Doe to have her preferred pronouns honored.

98.    In addition to seeking full economic redress for harms and damages as well as attorneys'

fees, the Plaintiff seeks with this litigation an order from the Court for equitable or injunctive relief to require the Defendant to insure Plaintiff and other people who are transgender with gender dysphoria for facial feminization surgeries on an equal and non-discriminatory basis; to adopt and enforce a written policy, procedure, or guideline to this effect; to perform necessary training and education related thereto; to immediately order the Defendant to perform a re-evaluation of Plaintiff's claim; to post and disseminate notice of the verdict in this matter; and for Defendant to hold sensitivity trainings for its employees, claims agents, representatives, and specialists.

**WHEREFORE,** as a direct and proximate result of the foregoing discrimination, Plaintiff suffered injuries and damages and requests that judgment be entered for Plaintiff and against Defendant for an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all actual damages, out-of-pocket costs and expenses, incidental damages, consequential damages, economic damages, and/or related damages as permitted by applicable law, an award of reasonable attorneys' fees, reasonable expert fees, and the costs and expenses incurred in this action, pursuant to 42 U.S.C. § 1988, and/or as otherwise provided by applicable Federal law, pre- and post-judgment interest, equitable or injunctive relief, and such other relief as this Court should deem just, proper, and equitable.

**COUNT III – VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT, AS AMENDED, 42 U.S.C. § 12101, *et seq.*
(PLAINTIFF, JANE DOE v. DEFENDANT, INDEPENDENCE BLUE CROSS)**

99.     Ms. Doe restates and realleges all previous paragraphs as though fully set forth here.

100.    IBX, as a public accommodation, is prohibited from discriminating against those with disabilities under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182(A):

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

101. Ms. Doe has a disability, GD, within the meaning of the ADA.

102. IBX is a public accommodation within the meaning of the ADA.

103. The IBX Denials violate the ADA by discriminating on the basis of disability in the denial of coverage for treatment meant to alleviate Ms. Doe's disability.

104. IBX acted with deliberate indifference to Ms. Doe's rights under the ADA.

105. As a direct and proximate result of IBX's aforesaid unlawful discriminatory practices Ms. Doe has sustained harm.

106. Ms. Doe seeks redress for IBX's violation of her rights under 42 U.S.C. §12133.

107. Plaintiff was directly and proximately caused by Defendant to suffer the following economic harms and damages on account of the Defendant's illegal and discriminatory actions, which amounts and any other amounts were reasonable, necessary, and related. Plaintiff seeks to recover from the Defendant in this action:

    a. $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related procedures;

    b. $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses;

    c. $12,902.00 in attorneys' fees and costs paid to Plaintiff's first attorney—not undersigned counsel—to challenge Defendant's illegal and discriminatory denials of insurance coverage to Plaintiff through Defendant's pre-litigation administrative process;

    d. Attorneys' fees and costs of previous counsel and undersigned counsel to prosecute the instant action;

     e.    Any other out-of-pocket expenses, incidental damages, consequential damages, economic damages, and/or related damages, compensable under local, state, or Federal law.

108.    In addition to wrongfully denying Plaintiff insurance coverage on account of her gender dysphoria disability, Defendant's agents, servants, employees, and/or representatives repeatedly and frequently misgendered Ms. Doe on account of her gender dysphoria disability, despite repeated requests from Ms. Doe to have her preferred pronouns honored.

109.    In addition to seeking full economic redress for harms and damages as well as attorneys' fees, the Plaintiff seeks with this litigation an order from the Court for equitable or injunctive relief to require the Defendant to insure Plaintiff and other people who are transgender with gender dysphoria for facial feminization surgeries on an equal and non-discriminatory basis; to adopt and enforce a written policy, procedure, or guideline to this effect; to perform necessary training and education related thereto; to immediately order the Defendant to perform a re-evaluation of Plaintiff's claim; to post and disseminate notice of the verdict in this matter; and for Defendant to hold sensitivity trainings for its employees, claims agents, representatives, and specialists.

**WHEREFORE,** Plaintiff requests that judgment be entered for Plaintiff and against Defendant for equitable or injunctive relief to require the Defendant to insure Plaintiff and other transgender people with gender dysphoria for facial feminization surgeries and related procedures on an equal and non-discriminatory basis; to adopt and enforce a written policy, procedure, or guideline to this effect; to perform necessary training and education related thereto; to immediately order the Defendant to perform a re-evaluation of Plaintiff's claim for the purposes of making payment to Plaintiff on her claim on an equal and non-discriminatory basis; to post and disseminate notice of the verdict in this matter; and for

Defendant to hold sensitivity trainings for its employees, claims agents, representatives, and specialists; an award of reasonable attorneys' fees, reasonable expert fees, and the costs and expenses incurred in this action, pursuant to 42 U.S.C. § 1988, and/or as otherwise provided by applicable Federal law, pre- and post-judgment interest, and such other relief as this Court should deem just, proper, and equitable.

### COUNT IV – INSURANCE BAD FAITH IN VIOLATION OF 42 Pa. C.S. § 8371 (PLAINTIFF, JANE DOE v. DEFENDANT, INDEPENDENCE BLUE CROSS)

110. Ms. Doe restates and realleges all previous paragraphs as though fully set forth here.

111. A contract of insurance existed between Plaintiff and Defendant.

112. Plaintiff qualifies as an "insured" under the definition supplied in 42 Pa. C.S. § 8371.

113. Defendant qualifies as an "insurer" under the definition supplied in 42 Pa. C.S. § 8371.

114. Plaintiff fulfilled her part of the insurance contract by purchasing the policy, and having her percentage or portion of the payment of the insurance premiums withheld from each of her paychecks.

115. By failing to cover Plaintiff for facial feminization surgeries, hair transplant, and related procedures, in clear violation of Defendant's own policies, medical bulletins, and/or references, and on account of discrimination against the Plaintiff, Defendant has violated 42 Pa. C.S. § 8371.

116. It is well-established law that an action for bad faith may extend to an insurer's investigative practices. See O'Donnell ex rel. Mitro v. Allstate Ins. Co., 1999 Pa. Super. 161, 734 A.2d 901 (Pa. Super. 1999); Grossi v. Travelers Personal Ins. Co., 79 A.3d 1141 (Pa. Super. 2013); Bodnar v. Nationwide Mut. Ins. Co., 2013 WL 2147807 (M.D. Pa. May 16, 2013).

117. Defendant had a duty to consider the good faith interests of its insured as a factor in

coming to the decision as to whether to cover the Plaintiff's claim.

118. Defendant owed to Plaintiff a duty to give her interests the same faithful consideration that Defendant gave Defendant's own interests.

119. Defendant owed a legal duty to Plaintiff, including the duty to timely investigate, evaluate, cover, and pay the claim within the policy provisions.

120. Defendant owed a legal duty to Plaintiff to timely investigate, evaluate, cover, and pay the claim within the policy provisions, and an equal and non-discriminatory basis.

121. Defendant owed a legal duty to Plaintiff not to discriminate against Plaintiff by denying coverage based on her gender identity or based on unlawful gender-based stereotypes.

122. Defendant breached these duties.

123. Defendant breached the contract by its conduct as described at length above.

124. Plaintiff believes, and therefore avers, that Defendant intentionally discriminated against Plaintiff, denied, delayed, obstructed, and/or failed to consider a claim that was proper under the insurance contract.

125. Defendant's claims agents or representatives misgendered the Plaintiff which occurred even after Plaintiff corrected the use of pronouns.

126. On one such occasion, Plaintiff was misgendered by a claims agent, corrected her preferred pronouns to the agent, and the claims agent again misgendered the Plaintiff, then sent the Plaintiff to "dead air," or a line with nobody on the other end, to wait in retaliation.

127. Plaintiff called back the number and was told to contact another individual and was then transferred to another extension. However, Plaintiff was actually sent to a general automated mailbox, which stated, "Input the name of the person you are trying to reach,"

and after multiple attempts of attempting to input the individual's name Plaintiff was provided, the directory did not recognize the name. Plaintiff called back the individual using another number.

128. Plaintiff recollects that she experienced episodes of emotional distress following phone calls with the Defendant's claims agents/representatives.

129. Defendant's illegal bad-faith actions deprived the Plaintiff of medically-necessary treatment.

130. Plaintiff's gender-dysphoria disability was exacerbated by Defendant's discriminatory acts. The surgeries at issue were life-and-death matters for Plaintiff.

131. Plaintiff was forced to expend large sums of monies to undergo various FFS procedures without being covered under Defendant's policy of insurance at that time.

132. Defendant's unlawful discrimination and the unlawful denial of insurance coverage to Plaintiff caused her to consider suicide.

133. The wanton disregard for Plaintiff's rights constitutes bad faith.

134. Based upon the facts pleaded above, Defendant lacked a reasonable basis for the following actions and omissions in violation of 42 Pa. C.S.A. § 8371, and acted recklessly and in conscious disregard of the facts, law, and obligations at issue, including:

      a.     Failing to properly evaluate Plaintiff's claim;

      b.     Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria on account of discrimination;

c.      Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria on account of transphobia;

d.      Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria due to stereotypes;

e.      Failing to offer coverage on a non-discriminatory basis and by discriminating against Plaintiff on account of her gender identity and/or on account of unlawful gender-based stereotypes;

f.      Failing to timely process Plaintiff's claim;

g.      Misgendering Plaintiff based on her gender identity and/or based on impermissible gender-based stereotypes;

h.      Refusing to honor Plaintiff's preferred pronouns even after Plaintiff corrected the use of her pronouns;

i.      Making discriminatory remarks to Plaintiff;

j.      Making inappropriate remarks to Plaintiff;

k.      By their actions causing Plaintiff to consider suicide;

l.      Forcing Plaintiff to spend money hiring attorneys;

m.      Conducting an investigation, evaluation and assessment with the purpose and effect of protecting and serving Defendant's own interests, rather than providing proper and faithful consideration to the Plaintiff's interests;

n.      Creating and implementing unlawful and inadequate policies, guides, procedures and practices with regard to claims investigations and claims handling;

o. Failure to adhere to Defendant's policies, guides, procedures, and practices with regard to claims investigations and claims handling;

p. Implementing and pursuing a claims handling/litigation policy and strategy with the design and purpose of deterring claims rather than protecting the interests of their insureds;

q. Failure to timely and adequately communicate with Plaintiff;

r. Breaching known legal duties to the Plaintiff out of financial self-interests;

s. Making redundant, unnecessary, and pretextual requests for documents and other materials;

t. Failing to pay in a timely manner;

u. Failing to pay a covered claim promptly and jeopardizing the financial security of Plaintiff with full knowledge that Defendant's actions were causing such a result;

v. Considering improper and impermissible criteria in the evaluation of Plaintiff's claim which had no bearing on any question of coverage;

w. Failing to train claims handling personnel properly;

x. Failing to obtain qualified personnel;

y. Attempting to strong arm Plaintiff through the pendency of their insurance claim, appeal, and litigation, utilizing a deep pockets strategy in the hopes that Plaintiff would be forced to simply go away;

z. Continuing to employ delay tactics;

aa. Exhibiting a pattern and practice of engaging in unfair or deceptive acts or practices to benefit the interests of Defendant to the detriment and expense of the Plaintiff;

bb. Failing to cover and/or pay the claim within a reasonable period of time;

135. Plaintiff believes, and therefore avers, that Defendant has violated the terms and conditions of the insurance contract and the applicable laws of Pennsylvania, for the reasons stated above.

136. It is believed and averred that Defendant's actions and/or inactions have been done with malice and in complete disregard for Plaintiff, Plaintiff's interests, Plaintiff's rights, and Plaintiff's health and safety.

137. It is believed and averred that Defendant intentionally delayed and subsequently denied Plaintiff's claims in order to make a larger profit at the expense of Plaintiff.

138. By collecting premiums from Plaintiff's pay and refusing to pay Plaintiff's claim, Defendant earned a large profit at Plaintiff's expense.

139. Defendant acted in bad faith and breached its duty to promptly and appropriate investigate, negotiate, evaluate, and pay the claim.

140. Defendant knew or recklessly disregarded its lack of a reasonable basis for committing these bad-faith acts.

141. Plaintiff was directly and proximately caused by Defendant to suffer the following damages on account of the Defendant's illegal and discriminatory bad-faith insurance practices. Plaintiff seeks to recover from the Defendant in this action:

a. $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related

procedures;

b.    $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses;

c.    $12,902.00 in attorneys' fees and costs paid to Plaintiff's first attorney—not undersigned counsel—to challenge Defendant's illegal and discriminatory denials of insurance coverage to Plaintiff through Defendant's pre-litigation administrative process;

d.    Any other out-of-pocket costs and expenses, incidental damages, consequential damages, and economic damages.

e.    Compensatory damages for Doe's exacerbated gender dysphoria ("GD"), body dysmorphia, negative body image and negative self-view, suicide ideation, psychological trauma, mental anguish, and severe emotional distress.

f.    Attorneys' fees and costs;

g.    Financial hardship;

h.    Consequential damages.

**WHEREFORE,** Plaintiff demands judgment in favor of Plaintiff and against Defendant in an amount in excess of the arbitration limits for all properly available damages under each and any of the claims set forth herein, including without limitation, as authorized under the law governing each claim, actual damages, out-of-pocket costs and expenses, incidental damages, economic damages, consequential damages, and other damages, as well as the damages provided pursuant to 42 Pa. C.S.A. § 8371 and the common law, including without limitation compensatory damages, humiliation and embarrassment, pain and suffering, loss of enjoyment of

life and life's pleasures, exacerbated gender dysphoria ("GD"), body dysmorphia, negative body image and negative self-view, suicide ideation, psychological trauma, mental anguish, and severe emotional distress, damages under 42 Pa. C.S.A. § 8371 in the amount of interest (prime rate) plus 3%, punitive damages, costs, including attorneys' fees, pre-judgment interest, post-judgment interest, and such further relief as the Court may deem just, proper, and equitable.

### COUNT V – BREACH OF CONTRACT AND OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (PLAINTIFF, JANE DOE v. DEFENDANT, INDEPENDENCE BLUE CROSS)

142.   Ms. Doe restates and realleges all previous paragraphs as though fully set forth here.

143.   At all times relevant hereto, Defendant issued and had in place for the Plaintiff a policy of health insurance (hereinafter "Plaintiff's Policy") to insure Plaintiff for health insurance.  At all times relevant hereto, Defendant insured Plaintiff for expenses and costs related to her healthcare.  A true and correct copy of what was provided to Plaintiff as the Commercial Medical Policy for the Treatment of Gender Dysphoria is attached hereto as Exhibit "A."

144.   At all times relevant hereto, Defendant's policy of insurance required Plaintiff to pay a percentage of health insurance premium costs from her pay.

145.   At all times relevant hereto, Plaintiff paid the required percentage of health insurance premium costs from her pay, and complied with all terms and conditions of the subject Policy.

146.   Under the terms of the insurance policy, Plaintiff paid valuable consideration to Defendant in exchange for insurance coverage.

147.   Plaintiff fulfilled her part of the contract.

148.   At all times relevant hereto, Plaintiff fully cooperated with Defendant in the handling of

her claim.

149. The insurance policy imposed certain contractual and other duties on Defendant.
See Exhibit "A."

150. The insurance contract included within it a covenant of good faith and fair dealing, which is included in every contract of insurance in Pennsylvania.

151. Defendant owed the Plaintiff a duty to evaluate her claim in good faith, on a non-discriminatory basis, and within the applicable policy provisions.

152. Defendant owed the Plaintiff a duty to protect and look out for Plaintiff's interests.

153. Plaintiff relied upon and reasonably believed that Defendant would fulfill its contractual obligations and duties.

154. Plaintiff reasonably believed that Defendant would protect her interests pursuant to the obligations contained in the insurance policy and would not place Defendant's interests ahead of the Plaintiff's.

155. Plaintiff submitted a claim for coverage of facial feminization, hair transplant, and related procedures, pursuant to the insurance policy.

156. Defendant has illegally denied coverage for the Plaintiff's claim.

157. Based upon the facts pleaded above, immediately below, and in the other counts set forth in this Complaint, Defendant breached Defendant's contractual obligations with the Plaintiff by:

    a.    Failing to properly evaluate Plaintiff's claim;

    b.    Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria on account of discrimination;

c. Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria on account of transphobia;

d. Failing to cover and pay Plaintiff's claim and the claims of other individuals who are transgender with gender dysphoria due to stereotypes;

e. Failing to offer coverage on a non-discriminatory basis and by discriminating against Plaintiff on account of her gender identity and/or on account of unlawful gender-based stereotypes;

f. Failing to timely process Plaintiff's claim;

g. Misgendering Plaintiff based on her gender identity and/or based on impermissible gender-based stereotypes;

h. Refusing to honor Plaintiff's preferred pronouns even after Plaintiff corrected the use of her pronouns;

i. Making discriminatory remarks to Plaintiff;

j. Making inappropriate remarks to Plaintiff;

k. By their actions causing Plaintiff to consider suicide;

l. Forcing Plaintiff to spend money hiring attorneys;

m. Conducting an investigation, evaluation and assessment with the purpose and effect of protecting and serving Defendant's own interests, rather than providing proper and faithful consideration to the Plaintiff's interests;

n. Creating and implementing unlawful and inadequate policies, guides, procedures and practices with regard to claims investigations and claims handling;

o. Failure to adhere to Defendant's policies, guides, procedures, and practices with regard to claims investigations and claims handling;

p. Implementing and pursuing a claims handling/litigation policy and strategy with the design and purpose of deterring claims rather than protecting the interests of their insureds;

q. Failure to timely and adequately communicate with Plaintiff;

r. Breaching known legal duties to the Plaintiff out of financial self-interests;

s. Making redundant, unnecessary, and pretextual requests for documents and other materials;

t. Failing to pay in a timely manner;

u. Failing to pay a covered claim promptly and jeopardizing the financial security of Plaintiff with full knowledge that Defendant's actions were causing such a result;

v. Considering improper and impermissible criteria in the evaluation of Plaintiff's claim which had no bearing on any question of coverage;

w. Failing to train claims handling personnel properly;

x. Failing to obtain qualified personnel;

y. Attempting to strong arm Plaintiff through the pendency of their insurance claim, appeal, and litigation, utilizing a deep pockets strategy in the hopes that Plaintiff would be forced to simply go away;

z. Continuing to employ delay tactics;

aa.    Exhibiting a pattern and practice of engaging in unfair or deceptive acts or practices to benefit the interests of Defendant to the detriment and expense of the Plaintiff;

bb.    Failing to cover and/or pay the claim within a reasonable period of time;

158.    Defendant has failed to offer coverage or to make payment pursuant to the policy, which has caused Plaintiff to expend large sums of monies in attempts to alleviate her gender dysphoria through medically necessary procedures that have been unlawfully denied coverage by the Defendant.

159.    As a direct and proximate result of Defendant's breach of its contractual duties and legal obligations of good faith as described above, Plaintiff suffered significant damages, including, but not limited to actual damages, out-of-pocket costs and expenses, incidental damages, consequential damages, economic damages, attorneys' fees and costs, and financial hardship.

160.    Plaintiff was directly and proximately caused by Defendant to suffer the following damages on account of the Defendant's illegal and discriminatory bad-faith insurance practices. Plaintiff seeks to recover from the Defendant in this action:

a.    $86,618.50 paid out-of-pocket by Plaintiff for costs and expenses related to facial feminization surgeries ("FFS"), hair transplant, and related procedures;

b.    $5,084.08 in out-of-pocket expenses including expenses related to travel, transportation, accommodations, and related expenses.

161.    All of Plaintiff's losses were solely and proximately caused by the actions and conduct of the Defendant, without any contribution, negligence, want of action, or other wrongdoing

by the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment in favor of Plaintiff and against Defendant in an amount in excess of the arbitration limits for all properly available damages under each and any of the claims set forth herein, including without limitation, as authorized under the law governing each claim, actual damages, out-of-pocket costs and expenses, incidental damages, economic damages, consequential damages, and other damages, including attorneys' fees and costs, pre-judgment interest, post-judgment interest, and such further relief as the Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby requests a trial by jury of eight (8) members on all counts so triable.

Respectfully submitted,

**FREUNDLICH & LITTMAN, LLC**

DATED: 04/20/2023     BY:     _/s/ Justin F. Robinette, Esquire_
Austin R. Freundlich, Esquire (I.D. # 205670)
Gregory C. Littman, Esquire (I.D. # 306806)
Justin F. Robinette, Esquire (I.D. # 319829)

1425 Walnut Street, Suite 200
Philadelphia, PA 19102
Tel: (215) 545-8500
Fax: (215) 545-8510
justin@fandllaw.com