**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANE DOE** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **INDEPENDENCE BLUE CROSS,** | : | |
| **QCC INSURANCE COMPANY and** | : | |
| **PERSONAL CHOICE HEALTH BENEFITS** | : | |
| **PLAN, a Comprehensive Major Medical** | : | |
| Group Contract, by and Between QCC | : | |
| Insurance Company, a Pennsylvania | : | |
| Corporation, and Klasko Immigration | : | NO. 23-1530 |

**MEMORANDUM OPINION**

**Savage, J.**                                                                                                                                             **November 21, 2023**

Defendant Independence Blue Cross ("IBX") denied insurance coverage for facial feminization surgeries for plaintiff Jane Doe,[1] a transgender woman diagnosed with gender dysphoria. IBX contends the surgeries were cosmetic and not medically necessary as required under the health benefits coverage provided through her employer. Ms. Doe claims that IBX's denial was based on sex, gender identity, gender stereotyping, and her status as a transgender woman with gender dysphoria. She asserts claims under the Affordable Care Act ("ACA") for underlying sex and disability discrimination, the Americans with Disabilities Act ("ADA"), the Employee Retirement Income Security Act ("ERISA"), and Pennsylvania's insurance bad faith statute.

IBX moves to dismiss pursuant to Federal Rule of Procedure 12(b)(6) on the grounds that: (1) Ms. Doe fails to plead intentional acts of discrimination based on sex or disability to support her ACA claims; (2) her ADA claim fails to plead a sufficient nexus to a physical accommodation; (3) the breach of fiduciary duty claim under ERISA, 29 U.S.C. § 1132(a)(3), is a repackaged claim for reimbursement of benefits which may only be

brought under § 1132(a)(1)(B); and (4) the insurance bad faith claim under Pennsylvania statutory law is preempted by ERISA.

We conclude that because she has plausibly alleged a violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.*, Ms. Doe has stated a claim of sex discrimination under the ACA.  She has not stated a claim for disability discrimination under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, to support an ACA claim.  Ms. Doe has also failed to state a claim under the ADA, her breach of fiduciary duty claim under ERISA is impermissibly duplicative of her claim for benefit reimbursement, and her Pennsylvania bad faith claim is preempted by ERISA.

## Background

The facts are drawn from the Second Amended Complaint.  For purposes of this motion, we accept them as true and draw all reasonable inferences from them in favor of Ms. Doe.

Ms. Doe suffers from gender dysphoria, a diagnosable medical condition listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"), and the International Classification of Diseases, 10th Revision ("ICD-10").[2]  Persons with gender dysphoria experience feelings of incongruence between the sex they were assigned at birth and their own gender identity, resulting in clinically significant distress and/or functional impairment.[3]  Medical experts and leading medical organizations, including the World Professional Association for Transgender Health ("WPATH") and the United States Department of Health and Human Services, recognize facial feminization surgeries ("FFS"), hair transplants, and related procedures as medically necessary treatments of

2

gender dysphoria.[4]  These procedures are the standard of care to help transgender individuals attain physical attributes that are more congruent with their gender identity, alleviating gender dysphoria.[5]

Ms. Doe has experienced repeated instances of mistreatment, harassment, and physical and sexual abuse on account of her gender identity and transgender status.[6]  As a result, she has difficulties with social and occupational functioning.[7]  She struggles going into public, working, and interacting and communicating with others.[8]

IBX provided Ms. Doe health insurance benefits under a policy sponsored by her employer through a Health Benefit Plan governed by ERISA.[9]  The plan covers "medically necessary" healthcare expenses.[10]  It excludes "cosmetic surgeries" which are defined as procedures "[w]hich are done to improve the appearance of any portion of the body" and "[f]rom which no improvement in physiologic function can be expected."[11]  Expenses to correct a "condition resulting from an accident" and "[f]unctional impairment which results from a covered disease, injury or congenital birth defect" are not excluded.[12]

IBX provided Ms. Doe a "Medical Policy Bulletin" explaining coverage for the "Treatment of Gender Dysphoria."[13]  The Medical Policy Bulletin lists a number of gender-affirming treatments that IBX deems "medically necessary," including hormone treatments, bilateral mastectomies, breast augmentations, genital reconstructive surgeries, and penile prostheses.[14]  Because these procedures are considered medically necessary, IBX covers them, provided certain criteria are met.  For example, breast augmentation as a gender-affirming procedure "is considered medically necessary and, therefore, covered" so long as the insured is at least 18 years of age, has been diagnosed with gender dysphoria, has been monitored by a doctor who recommends the procedure,

3

has used feminizing hormones for a 12-month period, receives regular psychotherapy, and has no uncontrolled health concerns.[15]

The Medical Policy Bulletin lists procedures IBX has deemed "cosmetic or potentially cosmetic."[16] Procedures in this category are covered only if "medical necessity demonstrating a functional impairment can be identified."[17] If the insured cannot establish medical necessity demonstrating a functional impairment, the procedure is not covered.[18] FFS and hair reconstruction procedures are listed under IBX's "potentially cosmetic procedures."[19]

IBX denied Ms. Doe's request for coverage of FFS surgeries, hair transplants, and "related procedures" to alleviate her gender dysphoria.[20] In response to her requests for an explanation, IBX representatives communicated that a "physical or functional component must be demonstrated."[21] She then submitted a statement detailing the ways in which her current body has prevented her from engaging and functioning in society.[22] She related that she lost her employment because of her actual and perceived status as a transgender woman.[23] She described being insulted and mocked on a daily basis during work and social interactions, physically assaulted and verbally harassed.[24] She could not "blend in."[25] In response, IBX representatives reiterated that a "physical or functional impairment must be demonstrated."[26]

Ms. Doe submitted photographs to support her request for gender-affirming facial and hair procedures.[27] Following her submission, an IBX representative advised her that IBX's coverage determination was based on a "personal impression of whether or not you look female."[28]

In its final determination denying coverage for FFS procedures,[29] IBX explained that Ms. Doe "did not demonstrate a facial appearance outside the broad range of normal for the female gender."[30]  IBX determined FFS was cosmetic and not medically necessary.[31]  It concluded that she had demonstrated a mental rather than a physical or functional impairment.[32]

Ms. Doe alleges that IBX's bases for denying coverage were both factually inaccurate and discriminatory.[33]  She claims that she demonstrated that her gender dysphoria is a functional impairment necessitating FFS,[34] and the procedures she requested are medically necessary standard of care treatments and not cosmetic for individuals with gender dysphoria.[35]  She contends that IBX's denial constitutes sex and disability discrimination because it was based on her status as a transgender individual, her gender dysphoria, and impermissible gender stereotypes.[36]  More specifically, she alleges that IBX's requirement that she demonstrate a facial appearance outside "the broad range of normal for the female gender" constitutes impermissible, discriminatory gender stereotyping.[37]  She further alleges that IBX's application of its policy is discriminatory because a person who is intersex or had some sort of disfigurement is covered for procedures, but a transgender individual seeking them to treat gender dysphoria is not.[38]

**Standard of Review**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the

5

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). All well-pleaded allegations in the complaint are accepted as true and interpreted in the light most favorable to the plaintiff, and all inferences are drawn in the plaintiff's favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) (quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991)).

A conclusory recitation of the elements of a cause of action is not sufficient. *Oakwood Lab'ys LLC v. Thanoo,* 999 F.3d 892, 904 (3d Cir. 2021). The plaintiff must allege facts necessary to make out each element. *Id.* (quoting *Iqbal*, 556 U.S. at 669, 679). In other words, the complaint must contain facts which support a conclusion that a cause of action can be established.

**Discrimination Under the Affordable Care Act**

Under the non-discrimination provision of the ACA, an individual shall not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" on the basis of race, color, national origin, sex, disability, or age. 42 U.S.C. § 18116(a). The ACA expressly incorporates the "enforcement mechanisms provided for and available under" four civil rights statutes: Title VI of the Civil Rights Act of 1964 (prohibiting race, color and national origin discrimination); Title IX of the Education Amendments of 1972 (prohibiting sex discrimination); the Age Discrimination Act of 1975 (prohibiting age discrimination); and Section 504 of the Rehabilitation Act (prohibiting disability discrimination). *Id.* Thus, to state a cause of action for a violation of the ACA non-discrimination provision, Ms. Doe must allege facts showing that (1) IBX

discriminated against her on the basis of race, color, national origin, sex, age, or disability in violation of the predicate federal civil rights statutes; and (2) IBX received federal financial assistance. *See Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 520–21 (S.D.N.Y. 2018); *Southeastern Pennsylvania Transp. Auth. v. Gilead Scis., Inc.,* 102 F. Supp. 3d 688, 699 n.3 (E.D. Pa. 2015) (finding that the rights of action under the ACA "are to be drawn from the four federal civil rights statutes listed in 42 U.S.C. § 18116(a) and applied depending upon the nature of the discrimination alleged").

Ms. Doe claims that IBX discriminated against her on the bases of sex as prohibited by Title IX and disability as prohibited by the Rehabilitation Act. Hence, she must allege facts making out causes of actions for violations of Title IX and the Rehabilitation Act.

Title IX prohibits an entity receiving federal financial assistance from denying benefits to any person on the basis of sex. 20 U.S.C. § 1681(a). To state a claim for damages under Title IX, a plaintiff must allege facts showing that the defendant's discrimination was intentional. *See, e.g.*, *Doe v. Mercy Cath. Med. Ctr.,* 850 F.3d 545, 562–63 (3d Cir. 2017) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174–79, 183 (2005)).

Discrimination based on an individual's transgender status is sex-based discrimination. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020). In *Bostock*, the Supreme Court concluded that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it also

applies to claims under Title IX. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

Discrimination against an individual with gender dysphoria constitutes discrimination based on sex and transgender status. *Fain v. Crouch*, 618 F. Supp. 3d 313, 324–25 (S.D.W. Va. 2022); *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 11166311, at *4 (M.D.N.C. Oct. 19, 2022) (quoting *Grimm,* 972 F.3d at 608) ("Gender dysphoria cannot be understood 'without referencing sex' or a synonym."). Discrimination based on gender stereotyping and an individual's degree of conformity with such stereotyping is actionable. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *see also, e.g.*, *A.H. by Handling v. Minersville Area Sch. Dist.*, 290 F. Supp. 3d 321, 331 (M.D. Pa. 2017) (holding that plaintiff adequately alleged Title IX and Equal Protection claims based on "a school policy that treated her differently on the basis of her transgender status or nonconformity to gender stereotypes"); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 680 (W.D. Pa. 2015) ("Sex stereotyping claims are based on behaviors, mannerisms, and appearances.").

Ms. Doe asserts that she has alleged facts demonstrating intentional discrimination.[39] She argues that IBX's determination of coverage for FFS procedures was the product of gender stereotyping. Its denial depended on "whether or not [she] conforms to society's expected standard for a cisgender female."[40] She contends that by considering gender-based stereotypes and the extent to which she conforms to them in its claim determination, IBX intentionally discriminated against her on the basis of her sex, gender identity, and gender nonconformity.[41]

8

IBX does not categorically exclude facial reconstructive surgeries or hair transplant procedures for all insureds. On the contrary, the policy covers these procedures for insureds who establish "medical necessity demonstrating a functional impairment."[42] There is no question that this language is gender-neutral on its face. But, as alleged in this case, IBX's application of the policy depended on subjective determinations based on gender stereotypes and Ms. Doe's conformity to them. IBX representatives informed Ms. Doe that the denial was based on a "personal impression of whether or not you look female."[43] IBX ultimately denied coverage on the basis that she "did not demonstrate a facial appearance outside the broad range of normal for the female gender."[44] Hence, if the allegations are true, IBX's coverage determination for Ms. Doe's FFS and hair transplant procedures necessarily depended on considerations of sex, gender, and gender conformity.

Considerations of sex and gender stereotypes and a plaintiff's conformity to them are prohibited under federal anti-discrimination laws. As a plurality of the Supreme Court explained in *Price Waterhouse v. Hopkins*, a Title VII case:

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."

490 U.S. at 251 (quoting *City of Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n.13 (1978)); *see also, e.g.*, *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004) (finding that a transgender man "sufficiently pleaded claims of sex

9

stereotyping and gender discrimination" where he "alleged that his failure to conform to sex stereotypes concerning how a man should look and behave was the driving force behind Defendants' actions"); *Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp. 3d 546, 554 (E.D. Pa. 2017) (quoting *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 290 (3d Cir. 2009)) (holding that defendant's alleged conduct "present[ed] a textbook example of gender stereotyping in that, according to [defendant], [plaintiff] 'fail[ed] to conform to a traditionally feminine demeanor and appearance.'").

Ms. Doe has alleged that IBX denied benefits based on a stereotype—what is "normal for the female gender."[45] The representative explained that the decision was based on the "personal impression of whether or not you look female."[46] Significantly, consideration of gender stereotypes has no bearing on the medical necessity of FFS as a treatment for gender dysphoria.

Accepting the allegations as true, they show IBX conflated gender identity with gender expression in determining Ms. Doe's claim. Gender dysphoria is marked by clinical distress resulting from incongruence between one's gender identity and natal sex.[47] Gender identity refers to an individual's own sense of identification with a given gender.[48] This is distinct from gender expression, which is an individual's outward expression of gender to others.[49] Gender-affirming treatments such as FFS are considered medically necessary to treat gender dysphoria because they alleviate feelings of incongruence between an individual's body and gender identity.[50]

The medical necessity determination must be made considering the insured's gender identity (how the insured perceived her appearance as incongruent with her female gender identity), not her gender expression. Nonetheless, IBX based its medical

10

necessity determination on markers of gender expression, that is, how she was perceived by others. IBX applied societal understandings of what a "normal" woman looks like and compared Ms. Doe's appearance to those norms. What matters is how Ms. Doe identified herself.

In sum, IBX's policy does not, on its face, condition coverage on sex, gender stereotypes, transgender status, or gender conformity or nonconformity. However, Ms. Doe has alleged facts showing that IBX applied its cosmetic procedure exclusion in a discriminatory manner. The alleged facts show that IBX's denial of coverage for FFS procedures was based, at least in part, on considerations of gender stereotypes and gender conformity or nonconformity. Having done so, Ms. Doe has stated a plausible claim that IBX's denial of coverage constitutes intentional discrimination based on sex in violation of Title IX and consequently the ACA. *See* 20 U.S.C. § 1681; 42 U.S.C. § 18116.

Having found that Ms. Doe has plausibly alleged discrimination based on sex, we turn to her claim that IBX discriminated against her based on disability in violation of the Rehabilitation Act.

The Rehabilitation Act provides that no qualified individual with a disability in the United States "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. In order to state a claim under the Rehabilitation Act, Ms. Doe must allege facts showing that: (1) she is a qualified individual with a disability; (2) she was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination; (3) the denial was based on her disability; and (4) IBX received federal assistance. *Forges v. Pennsylvania*

11

*Dep't of Corr.*, 933 F.3d 285, 288–89 (3d Cir. 2019); *see also Gilead Scis., Inc.*, 102 F. Supp. 3d at 699 (citing *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 551 (D.N.J.2000)).  To be actionable under the Rehabilitation Act, like under Title IX, the discrimination must be intentional.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013).

Ms. Doe's disability-based discrimination claim is based on her unsupported conclusory allegation that IBX "never" covers FFS procedures for anyone with gender dysphoria but covers the same procedures for other disabled individuals.[51]  Her own Second Amended Complaint contradicts this conclusion.  IBX covers FFS procedures to treat gender dysphoria when the claimant demonstrates that the procedures are medically necessary due to a functional impairment.  Ms. Doe is claiming that despite this policy, IBX has an unwritten practice of denying FFS coverage to every insured with gender dysphoria.  She avers no facts to support this bald conclusion.

Ms. Doe proffers "theoretical" examples that a person who is intersex or had suffered disfigurement would be covered under IBX's policy, but a person with gender dysphoria would not.  She does not cite any actual examples to support this claim.  Nor does she identify any facts to develop this theory.[52]

In short, her Second Amended Complaint is bereft of any facts demonstrating that the denial of coverage was based on her gender dysphoria as a disability. Although Ms. Doe has plausibly alleged that IBX's functional impairment determination involved impermissible gender-stereotypes in violation of Title IX, she has not alleged facts showing that the determination was based on her gender dysphoria as a disability.

12

Therefore, Ms. Doe has not stated a claim that IBX discriminated against her on the basis of a disability in violation of the Rehabilitation Act to support a claim under the ACA.

## Discrimination Under the Americans with Disability Act

The ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Title III of the ADA applies only to discrimination in the full and equal enjoyment of a place of public accommodation. *Id.*

Under the ADA, a "public accommodation" is a physical place. *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613–14 (3d Cir. 1998). To state a claim under this provision, the plaintiff must demonstrate "at the very least some 'nexus' between the physical place of public accommodation and the services denied in a discriminatory manner." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 120 (3d Cir. 1998) (citing *Ford*, 145 F.3d at 613).

In *Ford v. Schering-Plough Corp.*, the Third Circuit Court of Appeals held that the plaintiff had failed to state a Title III claim because the denial of her disability benefits had no connection to the insurer's physical office. 145 F.3d at 612–13. Accordingly, the Court concluded that she "was not discriminated against in connection with a public accommodation." *Id.* at 613. The Court explained that "an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled." *Id.* at 613; *see also James v. GEICO Ins. Co.*, No. 16-CV-2757, 2016 WL 9776068, at *4 (E.D. Pa. Nov. 16, 2016) (dismissing plaintiff's

13

ADA claim where her allegations of discriminatory conduct were "all related to the administration of the insurance policy and the benefits provided under it, not [insurer's] physical offices").

IBX argues that Ms. Doe's ADA claim fails to allege the requisite "nexus" to a public accommodation because her allegations of discriminatory conduct arise from the IBX insurance policy rather than IBX's physical offices.[53] Ms. Doe contends that she has alleged a sufficient nexus to a public accommodation because the IBX representatives were calling from IBX's physical office.[54] She is wrong.

That Ms. Doe had telephone conversations with representatives who were at IBX's office does not supply the requisite nexus between the discrimination and the physical public accommodation. There is no allegation that IBX's offices were in any way physically inaccessible to her. The discriminatory conduct alleged arises from IBX's administration of its insurance policy and not from the accessibility to its offices. Thus, Ms. Doe has not stated a plausible claim for relief under the ADA. *See Ford*, 145 F.3d at 613; *James*, 2016 WL 9776068, at *4.

### Breach of Fiduciary Duty Under ERISA, 29 U.S.C. § 1132(a)(3)

In Count IV, Ms. Doe asserts a claim for reimbursement of benefits against defendant Health Benefit Plan under 29 U.S.C. § 1132(a)(1)(B). In Count V, she asserts a breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3) against IBX.

Civil enforcement of ERISA is governed by 29 U.S.C. § 1132. That section enumerates the causes of action a plaintiff may bring under ERISA. Subsection 1132(a)(1)(B) allows a participant or beneficiary of a covered plan to bring an action to recover benefits due under the plan, enforce her rights under the terms of the plan, or

clarify her rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). Subsection 1132(a)(3) permits a participant, beneficiary, or fiduciary to bring an action to (a) enjoin violations of ERISA or the terms of the plan, or (b) obtain "other appropriate equitable relief" to redress such violations or enforce provisions of ERISA or terms of the plan. *Id.* § 1132(a)(3).

In *Varity Corp. v. Howe*, the Supreme Court described subsection 1132(a)(3) as a "catchall" provision which acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that [section 1132] does not elsewhere adequately remedy." 516 U.S. 489, 512 (1996).  District courts in the Third Circuit have construed *Varity* to mean that a plaintiff may proceed under subsection 1132 (a)(3) only where she seeks a remedy for injuries not available under subsection 1132(a)(1)(B). *See, e.g.*, *Greene v. Hartford Life & Acc. Ins. Co.*, No. CIV.A. 13-6033, 2014 WL 4473725, at *4 (E.D. Pa. Sept. 10, 2014); *Miller v. Mellon Long Term Disability Plan*, 721 F. Supp. 2d 415, 424 (W.D. Pa. 2010); *Cohen v. Prudential Ins. Co.*, No. CIV.A.08-5319, 2009 WL 2488911, at *4 (E.D. Pa. Aug. 12, 2009); *Erbe v. Billeter*, No. CIV.A. 06-113, 2007 WL 2905890, at *15 (W.D. Pa. Sept. 28, 2007).  If a plaintiff's subsection 1132(a)(3) claim seeks "precisely the same remedy" as her subsection 1132(a)(1)(B) claim, her claim under subsection 1132(a)(3) can not proceed. *Greene*, 2014 WL 4473725 at * 4.

IBX argues that Ms. Doe's breach of fiduciary claim under subsection 1132(a)(3) must be dismissed because it is "essentially" a claim for reimbursement of benefits which may only be brought under subsection 1132(a)(1)(B).[55]  IBX contends that Ms. Doe's "vague claim for equitable relief" is actually seeking reimbursement of monies owed under

15

the insurance policy—in which case "relief under § 1132(a)(3) is not appropriate."[56] We agree.

Ms. Doe's breach of fiduciary duty claim does not seek "other appropriate equitable relief" under subsection 1132(a)(3). Although she couches her claim as one for "declaration and/or declaratory relief," what she seeks is reimbursement of medical expenses. She does not seek relief beyond reimbursement. Therefore, her subsection 1132(a)(3) claim may not proceed. *See e.g.*, *Miller*, 721 F. Supp. 2d at 423–24 ("[S]ince Plaintiff has an adequate remedy under Section 1132(a)(1)(B) for the relief she seeks, there is no basis for invoking the catch-all relief provision contained in Section 1132(a)(3).").

## ERISA Preemption

Ms. Doe brings a claim under Pennsylvania's insurance bad faith statute, 42 Pa. Cons. Stat. § 8371. Bad faith claims arising from benefit plans governed by ERISA are preempted. In *Barber v. Unum Life Ins. Co. of Am.*, the Third Circuit determined that a bad faith claim under 42 Pa. C.S. § 8371 was both conflict preempted by ERISA's civil enforcement mechanisms and expressly preempted by ERISA section 514(a). 383 F.3d 134, 140–41, 144 (3d Cir. 2004) (citing 29 U.S.C. §§ 1132, 1144).

*Barber* controls. Ms. Doe's bad faith insurance claim under 42 Pa. C.S.A. § 8371 is preempted by ERISA.

## Conclusion

Ms. Doe has stated a plausible claim of discrimination based on sex in violation of the ACA. She has not stated a claim for disability discrimination under the Rehabilitation Act in violation of the ACA nor causes of action under Title III of the ADA, 29 U.S.C. §

16

1132(a)(3), and Pennsylvania's bad faith statute. Therefore, IBX's motion to dismiss will be granted in part and denied in part.

---

[1] Ms. Doe is proceeding anonymously. *See* Order (Apr. 21, 2023), ECF No. 4.

[2] Second Am. Compl. ¶ 11, ECF No. 18 ["Compl."].

[3] *Id.* ¶ 11, 23–26.

[4] *Id.* ¶¶ 12–14.

[5] *Id.* ¶ 28.

[6] *Id.* ¶ 22.

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶¶ 4, 128.

[10] Independence Personal Choice Health Benefits Program, at 102 (attached to Mem. of L. in Supp. of Mot. of Def. Independence Blue Cross to Dismiss Counts I, II, III, V and VI of Pl.'s Second Am. Compl., ECF No. 22 ["IBX's Br."] as Ex. 1, ECF No. 22-1).

[11] *Id.* at 43.

[12] *Id.*

[13] Commercial Medical Policy for Treatment of Gender Dysphoria (attached to Compl. as Ex. A, ECF No. 18-1), ["Medical Policy Bulletin"].

[14] *Id.* at 2–4.

[15] *Id.* at 3.

[16] *Id.* at 4.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Compl. ¶¶ 29–33.

[21] *Id.* ¶ 34–35.

[22] *Id.* at ¶ 36.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶¶ 37–38. Given our ruling that Ms. Doe has stated a sex discrimination claim based on gender stereotyping, we do not address the functional impairment requirement. We do not express any opinion whether IBX applied the requirement appropriately and correctly.

[27] *Id.* ¶ 40.

[28] *Id.*

[29] *Id.* ¶ 44.

[30] *Id.* ¶ 45.

[31] *Id.* ¶ 51.

[32] *Id.* ¶¶ 55–56.

[33] *Id.* ¶ 58.

[34] *Id.* ¶¶ 55–56.

[35] *Id.* ¶¶ 66–68.

[36] *Id.* ¶ 63.

[37] *Id.* ¶¶ 45, 52.

[38] *Id.* ¶¶ 59–62.

[39] Br. in Supp. of the Resp. of Pl., Jane Doe, in Opp'n to the Mot. of Def., Independence Blue Cross, to Dismiss 4–5, ECF No. 23 ["Pl.'s Br."].

[40] *Id.* at 6.

[41] *Id.* at 6–7.

[42] Medical Policy Bulletin 4.

[43] Compl. ¶ 40.

[44] *Id.* ¶ 45.

[45] *Id.*

[46] *Id.* ¶ 40.

[47] *Id.* ¶ 11.

[48] Compl. ¶ 9. The DSM-5 defines "gender identity" as a "category of social identity that refers to an individual's identification as male, female or, occasionally, some category other than male or female." DSM-5, Glossary of Technical Terms.

[49] *See* DSM-5, Glossary of Technical Terms (defining gender expression as the "specific ways in which individuals enact gender roles provided in their societies").

[50] Compl. ¶¶ 12–14, 28, 64, 66–67 (noting the treatment standards for gender dysphoria accepted by WPATH, the U.S. Department of Health and Human Services, leading medical organizations, and medical research).

[51] Pl.'s Br. at 9–10 (citing Compl. ¶¶ 59–62).

[52] At oral argument, plaintiff's counsel admitted that he is aware of other transgender claimants who have been covered for FFS under IBX's policy.

[53] IBX's Br. at 16–17.

[54] Pl.'s Br. at 10 (citing Compl. ¶¶ 108–10).

[55] IBX's Br. at 18–20.

[56] *Id.* at 20 (quoting *Erbe*, 2007 WL 2905890, at *15). At oral argument, plaintiff's counsel agreed that Counts V and VI are redundant but argued that the remedies are different. Plaintiff's counsel could not identify a difference in remedies. He conceded that if Ms. Doe has a claim under subsection (a)(1)(B) she does not need the claim under subsection (a)(3).